UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **JOHN A. RAFFONE**<br>**PLAINTIFF** | : | |
| | : | |
| **V.** | : | **CA NO.** |
| | : | |
| **CITY OF NEW HAVEN**<br>**DEFENDANT** | : | |
| | : | **DECEMBER 19, 2017** |

### COMPLAINT

### INTRODUCTION

1. This is an action for money damages, costs, attorneys' fees and other relief as a result of Defendant's violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 ("ADA"), the Family & Medical Leave Act, 29 U.S.C. § 2601, *et. seq.* ("FMLA"), Connecticut General Statutes § 31-51q, and the Connecticut Fair Employment Practices Act, Connecticut General Statutes § 46a-60 *et. seq.* ("CFEPA").

### PARTIES

2. Plaintiff, John A. Raffone, is an individual who presently resides in North Haven, Connecticut. At all times relevant to this Complaint, Plaintiff is an employee of Defendant.

3. Plaintiff has been diagnosed with chronic conditions, including hypertension and complications resulting therefrom, as well as Major Depressive Disorder and Generalized Anxiety Disorder. As such, Plaintiff is a person with mental and physical

disabilities within the meaning of CFEPA, and a qualified person with a disability within the meaning of the ADA.

4. Plaintiff's medical conditions of Hypertension, Major Depressive Disorder and Generalized Anxiety Disorder substantially limit one or more major life activities, including but not limited to his ability to work. Specifically, Plaintiff has difficulty concentrating and focusing on tasks.

5. Defendant, City of New Haven, is a municipality and political subdivision of the State of Connecticut.  Defendant is an employer within the meaning of, and subject to the provisions of, Connecticut General Statutes §31-51q, the ADA, the FMLA and the CFEPA.

6. Defendant has, at all times relevant to this complaint, been aware of Plaintiff's disabilities.

**JURISDICTION**

7. The United States District Court for the District of Connecticut has subject matter jurisdiction over this case under the provisions of 28 U.S.C. § 1331 and §1343(3) because it asserts claims under the ADA and the FMLA. The Court also has supplemental jurisdiction over the claims brought pursuant to the CFEPA and pursuant to Conn. Gen. Stat. § 31-51q under 28 U.S.C. § 1367.

8. Plaintiff filed claims with the Connecticut Commission on Human Rights and Opportunities ("CCHRO") and the Equal Employment Opportunity Commission ("EEOC") on or about January 26, 2017. Plaintiff received a release of jurisdiction from the CHRO on December 18, 2017 and a notice of right to sue from the EEOC on December 18, 2017.

2

**COUNT ONE:**     **DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANSWITH DISABILITY ACT, 42 U.S.C § 12101 *et seq.***

9.  Plaintiff began working for Defendant in or about 2007 in the position of Assistant Building Inspector in the Office of Building Inspection & Enforcement ("OBIE").

10. When Plaintiff commenced his employment with Defendant, Andrew Rizzo was the Building Official, Daniel O'Neill was the Deputy Building Inspector, Michael Corbett and Robert Walsh were Assistant Building Inspectors, and James Turcio was a Technical Compliance Officer.

11. Mr. Rizzo was appointed to the position of Building Official by then Mayor, John DeStefano, Jr.

12. Mr. Turcio held the position of Technical Compliance Officer, however, he filled in with building and zoning issues when directed by Mr. Rizzo and Mr. DeStefano. At this time in 2007/2008, Mr. Turcio did not have the proper license to conduct building inspections.

13. At the beginning of Plaintiff's employment, Plaintiff was informed that unsafe properties were allowed to remain standing and in that status without any action. Plaintiff was advised that actions were taken in the OBIE based on improper influence and favoritism and not in the best interest of the public.

14. The majority of these properties were owned and/or managed by companies that had longstanding relationships with influential members of the City of New Haven administration.

15. For example, Plaintiff learned of a property located at 808 Chapel Street and a garage next door to the building. Plaintiff was advised that the property on 808 Chapel Street was an unsafe structure and was allowed to remain standing and in

3

that status because of undue influence upon the OBIE. Plaintiff also learned that a structure being converted to a parking garage next to 808 Chapel Street on Orange Street had no sprinklers on the 4th floor even though this would have been required by the code cycle that it was converted under.

16. Plaintiff was also told that specific inspectors were assigned to certain jobs working with specific contractors.  It was implied that this was done because certain inspectors would not accept anything less than code and regulatory compliance, while others were more lenient. Plaintiff observed Mr. Rizzo specifically telling inspectors to stay away from certain job sites.

17. Plaintiff learned in 2008 that Mr. Turcio was performing building inspections without the license required to do so. When Plaintiff then questioned what Mr. Turcio's job was, they responded that they weren't sure beyond his political connections and the special treatment he received from the directors.

18. At the commencement of his employment, and within the first year or two of hearing about and witnessing the unsafe, unfair and unethical actions in the department, Plaintiff reported the issues to Mr. Rizzo.  Mr. Rizzo responded that he did not want Plaintiff to be like Mr. Corbett, meaning an individual who removed himself from a job or situation that seemed unethical.

19. Mr. Rizzo eventually removed Plaintiff from the office Plaintiff shared with Mr. Corbett and placed him an office with Mr. Turcio.  Plaintiff then learned that Mr. Turcio was the inspector that Mr. Rizzo assigned many jobs for people Mr. Rizzo had personal ties and/or relationships with.

20. From approximately 2008 – 2012, Plaintiff occasionally discussed his concerns relating to the questionable and potentially unethical actions in the department with Mr. O'Neill.  More specifically, Plaintiff was being told that buildings were unsafe by other inspectors, yet nothing was being done to address this issue.  Mr. O'Neill never took action on any of the issues of potential unsafe conditions.

21. In April 2013, Mr. Rizzo retired as Building Official and Mr. O'Neill was appointed Acting Building Official.

22. Following his retirement, Mr. Rizzo began working for the Housing Authority for the City of New Haven and started his own consulting business, AR Consulting, LLC. He worked with various investors, some of whom were politically close to former Mayor DeStefano.

23. When Mr. Rizzo began operating his own consulting business and working for the Housing Authority, he requested that Plaintiff be the inspector on various jobs.

24. On or around May 1, 2014, Plaintiff was assigned to one of the first inspections for Mr. Rizzo, located at One Long Wharf Drive. This was a job that Mr. Turcio had initially handled and Plaintiff was asked to finish by conducting the final inspection.

25. Shortly thereafter, Plaintiff recognized many discrepancies between the permits and the work being done at One Long Wharf Drive. There were several renovations done that were not included on the permits issued.  Because additional permits were missing, the property was not required to submit to several inspections that would have been required with those permits. The site also had low valuation, meaning the appropriate amount had not been paid to the City of New Haven for the permit fees that would have been assessed.

26. In this final inspection process, Plaintiff also learned that a check for an electrical permit was being held by Crystal Vazquez, Program Fiscal Coordinator.  Because the application for the permit had not been processed, the check was not deposited.

27. Ms. Vazquez had been hired by Mr. Rizzo when he was the Building Official and was also a friend of the contractor doing the job at One Long Wharf Drive, Mike Herb of Continental Contracting. Mr. Herb was also a friend of Mr. Rizzo and an individual Mr. Rizzo worked with frequently. Plaintiff asked Ms. Vazquez why she was holding the check for the permit and she responded that Mr. Rizzo asked her to do so. Failure to process the permit and deposit the check as payment therefore violated the City of New Haven regulations.

28. On May 2, 2014, Plaintiff prepared an Inspection Report for One Long Wharf Drive. Plaintiff specified in the report that the job needed an electrical permit, final inspections, and approval from the Fire Marshal.

29. In May of 2014, Plaintiff was assigned to another job related to Mr. Rizzo at 555 Winchester Avenue. In reviewing this job, Plaintiff found low valuations and informed the investor that the valuations were extremely low, to which the investor responded that he worked with Mr. Rizzo on the job prior to the issuance of the permit. Plaintiff requested that the investor provide a revised estimate prior to the issuance of a Certificate of Occupancy ("CO").  Plaintiff then learned that the check provided to the department was returned for insufficient funds, and that several phone calls were made in an attempt to collect the funds due, with no response.  Per policy, practice and regulations, the CO should not have been issued if the check did not clear.

When advised the check did not clear, no other approvals should have been given and to the extent a CO was issued, it should have been rescinded.

30. Despite continued non-payment, this site was still receiving preferential treatment from Livable Cities Initiative ("LCI") and continued to receive approvals for work.  It appeared that LCI was providing the site and contractor with whatever was needed to continue to move the project forward. For example, an easement was required to allow the installation of a new window located on the property line. Plaintiff advised Mr. O'Neill of a potentially illegal and unethical situation. Mr. O'Neill responded that he would take care of everything. Plaintiff was then removed from the assignment at this site.

31. Plaintiff was also assigned to inspect a job at 519 East Street during May of 2014. This address had ongoing work with some inspections performed, but the values were again very low considering the scope of the work, meaning the City of New Haven was not receiving the appropriate fee for the work.   Plaintiff reported this situation to Mr. O'Neill. Plaintiff was removed from the assignment at this site.

32. Plaintiff continuously advised Mr. O'Neill of the issues he found, questions he had, and his concerns of unethical or illegal behavior.

33. On July 15, 2014, Plaintiff sent an email to Mr. O'Neill concerning the verbal abuse he was receiving from Mr. Turcio.  As a result of this email, a meeting was held on or about August 4, 2014 with Plaintiff, Matthew Nemerson, Director of Economic Development, and Michael Piscitelli, Deputy Economic Development Administrator.

34. During this meeting, Plaintiff was asked what he wanted to do regarding the complaint and responded that he wanted a safe place to work and the opportunity to

discuss very important public safety issues that were obvious without fear of retaliation. Mr. Nemerson and Mr. Piscitelli responded that they could only address the treatment by Mr. Turcio at that time and would revisit the other issues at a later date, which did not happen.

35. Shortly after this meeting, Plaintiff requested to be removed from jobs he had been assigned with Mr. Rizzo as he was not comfortable with the discrepancies and unanswered questions surrounding these jobs and did not want to be part of ongoing unethical behavior surrounding jobs associated with Mr. Rizzo.

36. Specifically, on August 6, 2014, Plaintiff sent an email to Mr. O'Neill concerning Mr. Rizzo. In this email Plaintiff discussed the accounting person holding a check with respect to the Long Wharf job and stated, "This is why I have asked to be removed effective <u>today</u> 8-6-14 on any of Andy's jobs that have been assigned to me until we can clear up some questions."  The email continued, "As you may or may not know other departments have concerns about Andy's role in many projects that have unanswered question and or concerns...I know this will not be easy on any of us. But in the end it will be worth it. This City deserves the best Department it could have including doing the things that matter to the people protect, the people that we try to guide to a safe place and all of our counter parts that make up our Public Safety Partnerships."

37. Shortly after sending the email, Mr. Rizzo stormed into Plaintiff's office saying that he read the internal email Plaintiff sent and threatened Plaintiff's job by stating that he was not going to say anything good about Plaintiff.

8

38. On August 7, 2014, Plaintiff sent another email to Mr. O'Neill, and copied Mr. Nemerson, alerting them of the situation and that he felt threatened by Mr. Rizzo.

39. On August 26, 2014, Plaintiff sent an email to Mr. O'Neill, per his request, outlining the jobs that needed to be reviewed and requesting they be reassigned to another inspector. This email identified Plaintiff's concerns with One Long Wharf, 555 Winchester Avenue and 519 East Street. Based on prior incidents, Plaintiff specifically noted at the close of his email that it was a private email that should not be shared with Mr. Rizzo or anyone other than who would be looking into the issues so that Plaintiff would not suffer retaliation.

40. On August 27, 2014, Plaintiff sent another email to Mr. O'Neill and copied Mr. Nemerson. In this email Plaintiff asked to meet and discuss options for him regarding a possible transfer to another department.

41. Shortly after Plaintiff's August 26th email, cash receipts for years prior to 2010 were destroyed for no apparent reason.

42. Destruction of records had also occurred prior to and after Plaintiff's email. The files being removed were building files and permit files for jobs that Mr. Rizzo had been in charge of as Building Official. Plaintiff reported the removal of files to Mr. O'Neill on more than one occasion.

43. The front desk worker at this time, Salina Manning (currently Program Coordinator), also allowed the copying and removal of various job records that Mr. Rizzo wanted to retrieve.

44. James Eggert, Assistant Building Inspector, was also aware of the removal of records after hours.

45. On September 5, 2014, Plaintiff contacted Mr. O'Neill by telephone to reiterate his concerns of the records being removed from the department.

46. On September 8, 2014, Mr. O'Neill wrote a letter to Plaintiff thanking him for the phone call about his concerns over the security of the records and stated that he addressed the issue with staff and appropriate party.  Mr. O'Neill assured Plaintiff that it would not happen again, and noted that "with this correspondence, I consider the matter closed and will not be discussing it again."

47. Despite the September 8, 2014 letter from Mr. O'Neill the removal of records continued for at least another year through 2015.

48. On October 20, 2014, Mr. O'Neill sent an email to staff advising them of a mandatory session with a representative from the Employee Assistance Program ("EAP") to speak to all of the employees in the OBIE about behavior in the workplace.

49. This was the result of Plaintiff's continued reporting of inappropriate behaviors in OBIE.

50. On January 29, 2015, Mr. O'Neill sent an email to the Assistant Building Inspectors regarding a permit reorganization stating that Mr. Turcio would no longer be handling building permit inspections and that his permits would be divided up among the remaining Assistant Building Inspectors.  As a result, Plaintiff was assigned several of Mr. Turcio's permits.

51. On February 17, 2015, Plaintiff was parked on the corner of Orange and Chapel Streets. Based on the comments made to him by co-workers in 2007/2008 when Plaintiff began his employment, Plaintiff knew the building located at 808 Chapel Street was unsafe pursuant to Section 115 of the Building Code of the State of

Connecticut ("Building Code"). While parked, he saw that a soffit from the building was falling.

52. The location of this building was of significant concern because the building was at the street line over a city bus stop. Pedestrians were walking under the hanging soffit, including mothers and children in baby carriages.

53. Plaintiff took action in accordance with Section 116 of the Building Code and immediately contacted the property owner, Corner Block Development, advising them of the dangerous situation. Plaintiff spoke with Chris Vigilanti, who promised to immediately visit the property and attend to the safety issue.

54. Plaintiff also contacted New Haven Public Works to cordon off the side walk with barricades, which they did.

55. Plaintiff told Mr. Vigilanti that he would need an engineer's report on the structure because Plaintiff knew the structure had been unsafe for many years.

56. Plaintiff put a handwritten report together concerning the incident that day, including photographs. Plaintiff spoke to Mr. Walsh, acting Deputy Building Inspector on this day, when he returned to the office and discussed his findings. As instructed by Mr. Walsh, Plaintiff put his report on Mr. O'Neill's desk.

57. When Mr. O'Neill returned to the office, Plaintiff spoke to him about his actions at the property at 808 Chapel Street and the request for the property owner to provide an engineering report to substantiate that the building was safe. Mr. O'Neill said he would take care of it from there.

58. Plaintiff never saw any documentation, inspection reports or engineering reports, but over the next few days he saw contractors with high lift equipment stabilizing falling parts on the building. Several months later, in August 2015, the building collapsed.

59. This building at 808 Chapel Street had continuously failed inspections since before Plaintiff's employment with Defendant. Upon commencing his employment, this property was one that co-workers informed Plaintiff about as being an unsafe structure allowed to remain in such a condition despite the ongoing violations and failed inspections. Plaintiff never saw an engineering report for this location following the actions he took and further questioned Mr. O'Neill and Mr. Turcio about the alleged report, noting that the engineering report would never have said the building was in an acceptable condition. Mr. O'Neill and Mr. Turcio stated they had seen the report and the building was sound, to which Plaintiff responded by asking why the building collapsed.

60. In late February 2015, Mr. Turcio was appointed as Building Official and Mr. O'Neill returned to the Deputy Inspector position.

61. On October 21, 2015, Plaintiff conducted a routine inspection at 174 Huntington Avenue for Mr. Turcio. Plaintiff reported to Mr. Turcio that the permit for the property had low values compared to the work performed, had only a frame inspection, and was missing mechanical permits.

62. Plaintiff subsequently conducted a routine inspection of a property located at 152 Huntington Avenue. In his Inspection Report, Plaintiff noted the status as "conditionally approved." Plaintiff included comments stating that the final inspection was requested on December 1, 2015 by Mr. Turcio and that the owners of

the property had been notified of the low values compared to the work performed and that missing permits were among the items listed for final inspection. Mr. Turcio was informed of the status of this property by Plaintiff's report.

63. In or around November 2015, Plaintiff was assigned an inspection at a job located at 85 Ward Street by Mr. Corbett as he was filling in at the counter assigning permits.

64. The property located at 85 Ward Street was a two family house that had been improperly converted into a three family house.  Based on Plaintiff's experience, a permit to convert this property would have been denied.

65. Mr. Turcio had made it known to Plaintiff when he took over as Building Official that he and Mr. DeStefano had become good friends again. The two had a longstanding friendship, but when Mr. Turcio became Building Official, Mr. DeStefano began calling him on a regular basis.

66. Mr. DeStefano had a longstanding relationship with NHR Properties ("NHR"). Mr. DeStefano was and is the Executive Vice President of Start Bank of New Haven, which is currently located in a building owned by Whalley Redevelopers, LLC, and managed by the same individual who manages NHR. Start Bank has always been located in properties owned by or affiliated with NHR.

67. At the time of Plaintiff's inspection at 85 Ward Street, Mr. Turcio commented on his friendship with former Mayor DeStefano.  NHR also owned 85 Ward Street.

68. Pursuant to Sections 104.4 and 104.6 of the Building Code, Plaintiff attempted to inspect this property on several occasions, but was locked out of it by NHR.  Plaintiff made phone calls to NHR stating that he would like to visit the property, but he never received a return phone call. Plaintiff advised Mr. Turcio of this situation.

69. After Plaintiff was locked out of the property, a recently hired Assistant Building Inspector, Frank Bellonio, was assigned to inspect a job at 85 Ward Street concerning several other permits that had been applied for.

70. On November 2, 2015, Mr. Bellonio, conducted a framing inspection of the property located at 85 Ward Street. Mr. Bellonio's report noted a "fail" status based on several code violations, including fire safety issues in a three family house.

71. On or about December 14, 2015, Plaintiff visited the property. There was work going on at the time so he was able to conduct a routine inspection. Plaintiff saw, and documented by photographing the site, numerous violations. For example, the job was missing an electrical permit, the conversion from a two to three family home was apparent, there was missing fire protection and poor construction methods. Plaintiff concluded this was a threat to public safety and toured the property with the construction manager in order to alert him to the many ongoing building code violations on the property. Plaintiff also advised Mr. Turcio of the many ongoing violations.

72. Plaintiff prepared an Inspection Report for the property at 85 Ward Street and noted the status as "fail." Plaintiff's Inspection Report noted that there was no upgrade in the permit for the work performed, no structural review, no passed inspections, no heating permit and that the values for all permits for the trades working on the property were very low, all in violation of the City of New Haven regulations, specifically Sections 105.3.1, 704.3 and 704.5 of the Building Code.

73. Shortly after inspecting the property at 85 Ward Street, preparing the inspection report and advising Mr. Turcio of the numerous ongoing violations, Mr. Turcio called Plaintiff into his office for a meeting to discuss the report.

74. During this meeting, Mr. Turcio stated that he had received a phone call from former Mayor DeStefano regarding the building inspection activity at 85 Ward Street involving NHR. Mr. Turcio instructed Plaintiff to stop going to the property and removed Plaintiff from the assignment.  Mr. Turcio stated that he was assigning the inspection duties to Mr. Bellonio and Mr. Corbett. Mr. Turcio also stated that if Plaintiff went to the property again, "they" would make a complaint against him, implying former Mayor DeStefano and NHR would make a complaint because Plaintiff was doing the work he was required to do by statute.

75. Plaintiff told Mr. Turcio that he would forward Mr. Bellonio the list of violations he had logged in the office computer system along with the photographs demonstrating code violations. Plaintiff also offered to be at the site for a meeting to review the violations and his findings and forwarded all the information he had on 85 Ward Street to Mr. Turcio and Mr. O'Neill after the meeting.

76. When Plaintiff followed-up with Mr. Corbett about the code violations at 85 Ward Street, Mr. Corbett responded that there was "too much drama on that job" and that he would not be a part of it.

77. Plaintiff later asked Mr. Bellonio about the status of the property violations at 85 Ward Street and was told that Mr. Bellonio was instructed not to contact Plaintiff about any deficiencies on that job and that Mr. Turcio and Mr. O'Neill instructed Mr. Bellino not to visit the site with Plaintiff.

78. On or about December 23, 2015, Mr. Bellonio conducted a routine inspection of 85 Ward Street and again noted the status as "failed". This time he noted that a mechanical permit was needed and many items that needed work.

79. On December 23, 2015, Plaintiff sent an email to Mr. Turcio, copied to Mr. O'Neill, addressing his concerns with 85 Ward Street. Specifically, Plaintiff noted that he wanted to review the inspection results "regarding the unsafe construction at this address" with Mr. Bellonio prior to his revisit, that Mr. Bellonio told Plaintiff that Mr. O'Neill and Mr. Turcio asked that Plaintiff not join him on the job; and that none of the information Plaintiff shared with Mr. O'Neill and Mr. Turcio was discussed with Mr. Bellonio.  Plaintiff's email stated:

> They are all important issues that should not be taken lightly. When I asked about the fire separations he did not know what the issue was about and did not view this and other areas of concern that should have been discussed with the inspector of record. This is not a good thing for all involved. Furthermore this house … should not be recognized as a 3 because it never was and even though someone has remove[d] the old permits that would have shown this to be the case the original maps show it as a 2fam and price and lee confirm that it was vacant in 1963. Vacant mean[s] no one has occupied the space or there would have been 3 tel numbers. Check into it. This owner has gotten away with 3 family recognition without going through the proper approvals. There is no off street parking and the structure is close to adjoining propert[ies]. This property owner has done major structural repairs without permits and have understated the values by at least 50k. I feel that my opinion in this case does not mean much based on the way the entire [incident] was handled. We need to get this right if we want others to follow the rules that we enforce for all. I know our permit assignment[s] are out of order with regards to who goes where. Many permits have multiple inspectors assigned even though keeping it uniform could help get consistent compliance and allow for a relationship for knowing what's not done or needs to be done."

80. On December 29, 2015, Plaintiff was asked to fill in on an inspection for Mr. Eggert at 3 Long Wharf Drive. This property, a hotel, was also owned by NHR. When Plaintiff arrived at this job site, he again recognized many violations of the building code beyond the scope of permits.

81. As a result of this inspection, on December 29, 2015, Plaintiff sent an email to Mr. Turcio addressing further violations involving NHR and the building located at 3 Long Wharf. The email stated:

> Jim. Once again NHR is pulling the wool over on us. Today a request for a footing inspection revealed many other trades working in units building walls doing mechanical work and so on. When I spoke with one of the workers he informed me that balconies were removed, rail systems were replaced not repaired all ignoring current codes that would have required they meet new standards. They are replacing dish washers, new sinks, new Elec fixtures, new electric work not included in current permits. I know that these people are close with the prior Mayor, Andy Rizzo and Mike Herb. As you know they are frequent offenders of no permits low values and when complaints are brought forward the inspector falls Victim to reprimanding and threats of complaints that cause sickness in my body. This is old news and these car[l]ess actions cheat people's safety and rob the funds from the city by getting away with work that requires permits inspections and fees to pay the department to do its job. The contractor said Mike Herb told him that if Andy Rizzo was in the building department they would not have had any problems. As you know I have uncovered many jobs that Andy Rizzo and others that have had a close relationship with Andy Rizzo and feel that as a public safety inspector I am unable to provide the protection that the job requires. I have been affected emotionally over the missing accountability that should be the foundation of a very important department like ours. Please share this report with someone that can help us restore safety, honesty and integrity to our department. I have started the medication again to help with the anxiety that this type [of] pressure brings on to me. Will I be fired for exposing the unethical practices of those who once lead our department that practice by intimidation and cronies who stand up tell the truth all while suffering thru the tactics that try to destroy people thru (cronyism]. There are answers to the

17

problems if we look at the failings that are so clear today. Please
Help Me Jim Turcio. Please.

82. At the time he wrote this email, Plaintiff had a significant increase in his job related
stress and anxiety.

83. On December 30, 2015, Plaintiff received an email from Mr. Turcio, copied to Mr.
O'Neill, Mr. Nemerson, Cherlyn Poindexter, president of Plaintiff's union local
chapter, and Stephen Librandi, Manager Human Resources for the City of New
Haven. This email stated, "John, as of today, 12-30-15, I'm taking you out of the field
until further notice. Please refer all your calls to me and put the plans for 260 Crown
St and the school on Oranges St on the front counter with all the inspection reports.
You will stay in the office to catch up on your paper and computer work."

84. Plaintiff responded to Mr. Turcio's email informing him that he was scheduling an
appointment with the EAP therapist and stated, "I am a public safety inspector. If I
see something I need to say something. I will be out until I can get approval from
her...We will get this very important part right in public safety."

85. On December 31, 2015, Plaintiff wrote an email with the subject line "HOPE."
Plaintiff forwarded this email to numerous individuals, including Mayor Harp, Mr.
Turcio, Mr. O'Neill, Mr. Walsh, Mr. Nemerson, Mr. Eggert, Ms. Vazquez, Mr. Corbett,
and Ms. Poindexter. This email represented a plea to the administrators to enforce
the City of New Haven's building code in order to assure public safety despite the
political pressures imposed on the office by past and present leaders in the city.
Among other things, Plaintiff's email stated the following: (1) "Seeing is believing. I
heard a lot about what was going on when I arrived at my dream job with hope of
protecting people and helping those who construct these places safely that people

18

may call home." (2) "Public safety is about saving people's lives through codes that regulate how we build structures that house our people, our children, our parents and our friends." (3) "As I reported the things that were going on, the people in charge were passing on the discovery to past and current leaders and things really got bad for me."

86. On January 4, 2016, Plaintiff arrived at work and when approaching the building saw Mr. Turcio waiting outside. Mr. Turcio told Plaintiff to leave the work premises. Mr. Turcio also said he wanted Plaintiff to go to the doctor and that he was going to try to save Plaintiff's job. Plaintiff was not allowed to enter the building and left the premises.

87. Plaintiff was thus forced out of work against his wishes.

88. While out on this forced leave of absence, Plaintiff was required to utilize sick time and personal time. Plaintiff also applied for Short Term Disability benefits, however Plaintiff only received 66 2/3% of his weekly earnings through these benefits.

89. The City of New Haven's Department of Human Resources, Family & Medical Leave Policy, Frequently Asked Questions & Answers, Question No. 5 states, "Q. Can the City count an absence as FMLA leave without an employee requesting it? A. Yes. If you have been absent from work for 3 consecutive days on sick leave, your Department Head will request medical documentation. If the medical documentation indicates that your absence comes under the FMLA statute, then he or she    will contact you and may notify you that your entire period of absence will be counted as FMLA leave."

90. Despite this language, Mr. Turcio never requested medical documentation. However, during his time out, Plaintiff treated with the EAP therapist, Georgann Witte, Ph.D.  Pursuant to the City of New Haven's policy, this leave of absence should have been classified as FMLA leave.

91. Plaintiff was provided medical clearance by Dr. Witte, to return to work, full duty, on February 5, 2016. Human Resources received the letter from Plaintiff's doctor releasing him to work on February 5, 2016.

92. When Plaintiff attempted to return to work on February 8, 2016, Mr. Turcio would not allow Plaintiff to return to the workplace.

93. On February 9, 2016, Plaintiff's union president, Ms. Poindexter, filed a grievance on Plaintiff's behalf stating that Plaintiff was out on FMLA leave and was set to return on February 5, but his Department Head placed Plaintiff on administrative leave. The grievance specifically states: "No documentation regarding his leave or work performance was sent to Mr. Raffone or his Union President." The "Adjustment required" was to "Please cease from delaying Mr. Raffone's return to work. Please cease and desist from removing John's duties and responsibilities. Please cease disparate treatment and whatever makes the grievant whole."

94. In a letter dated February 10, 2016, Mr. Turcio falsely claimed that Plaintiff was not present for work from January 4, 2016 to February 5, 2016 "without prior notice or consultation." The letter further stated that "These actions merited further investigation. That investigation is now complete. For record purposes, please be advised that you were placed on Administrative Leave with pay for the dates February 8 – 10, 2016. You may return to work on February 11, 2016 (tomorrow)."

95. Contrary to the false statement in Mr. Turcio's letter, Plaintiff was not out of work "without prior notice or consultation."  Indeed, it was Mr. Turcio who refused to allow Plaintiff to enter the building on January 4, 2016 and who told Plaintiff to go see a doctor, forcing Plaintiff out on a leave of absence.

96. Upon his return, Plaintiff was not returned to his office and his desk. His computer was taken away and given to another employee.  Since Plaintiff needed to input information into the computer system, he was put at the front desk and provided access to a computer he was not familiar with. In addition, Plaintiff's entry card was not working so he was having a difficult time getting into the office. Further upon his return, Plaintiff was shunned and treated differently by co-workers and supervisors.

97. After returning to work in February 2016, Plaintiff was not assigned or given work that he was performing at the time he went out on leave. Plaintiff's regular duties and responsibilities were taken away from him upon his return following his leave of absence and complaint regarding unethical conduct.

98. On February 22, 2016, Plaintiff sent an email to Mr. Turcio. In this email Plaintiff addressed issues that were causing him to be "uneasy." Specifically, Plaintiff noted his concerns of being given busy work of no consequence consisting of follow-up on older roof and siding permits where there had been no call for an inspection. Plaintiff questioned the direction to no longer do any mechanical inspections and being asked to return to the office "promptly by 3 pm," even though other Building Inspectors were not required to abide by this requirement.  Plaintiff pointed out that when Plaintiff requested extra time he was told the budget did not allow for it, yet other Building Inspectors have been allowed extra time.  Plaintiff advised Mr. Turcio

that he had been told by a contractor that Mr. Turcio approved construction without

any inspection of the work.  Plaintiff protested that Mr. Walsh had yelled at Plaintiff in

the lobby in the presence of others demonstrating hostility to Plaintiff based on his

prior emails raising unethical conduct.  Plaintiff also raised concerns of contractors

and home owners who had work approved by Mike Rispoli, Chief Plumbing &

Heating Inspector, but were then told that the mechanical work was not approved

when re-inspected by Mr. Belloni.

99. On February 23, 2016, Plaintiff received an internal Memorandum from Mr. Turcio

asking Plaintiff to report to his office on February 24, 2016 at 11:00 a.m., "with or

without union representation to discuss your recent email."

100.    On February 25, 2016, Plaintiff received an internal Memorandum from Mr.

Turcio requesting that on March 3, 2016 at 3:30 p.m. Plaintiff report to the HR

conference room "with or without union representation to discuss your February 22nd

email."

101.    On February 26, 2016, Plaintiff emailed Mr. Turcio, copied to Mr. O'Neill,

informing them that he was too sick to work and was requesting vacation time.

102.    On February 26, 2016, Plaintiff notified Human Resources of his need to take a

leave of absence under the FMLA.

103.    On February 29, 2016, Plaintiff sent an email to Mr. Turcio, copied to Mr. O'Neill,

addressing events that occurred the previous Friday, February 26th. Specifically,

Plaintiff stated that Mr. Corbett "lashed out" at Plaintiff, becoming verbally aggressive

toward him. Plaintiff also stated in this email that, "You have taken my jobs from me

and have me closing out older permits that have low importance in the realm of all

the important work going on and be short staffed on top of it. While I enter these old permits it is clear to me that on many occasions many permits for mechanicals and building have never been closed out."

104.   On February 29, 2016, Plaintiff received an internal Memorandum from Mr. Turcio again requesting that he report to the HR conference room at 3:30 p.m. on March 3, 2016, with or without union representation, to discuss his work performance since his return, emails and alleged absence without notice on February 26th.

105.   On March 9, 2016, Plaintiff received notice that his FMLA had been approved for the time period of March 1, 2016 through May 24, 2016.

106.   On March 25, 2016, Dr. Witte filled out a Mental Health Provider Report citing a diagnosis of Generalized Anxiety Disorder and Major Depressive Disorder, recurrent, moderate. This form also noted that Plaintiff was not able to return to work under his current employment situation, but could return in a different work environment, department or under a different supervisor on or about May 1, 2016.

107.   On April 8, 2016, Plaintiff submitted a Civil Service Request for Transfer Form seeking a transfer to a vacant position similar to his current position in any department.

108.   On April 20, 2016, Dr. Witte provided a medical note offering her opinion on Plaintiff's plan to transfer. Dr. Witte specifically stated, "Mr. Raffone felt ignored and marginalized by both his boss and coworkers after he began reporting what he saw as a serious and longstanding pattern of corruption in the inspection and permit process in the Building Department." The medical note continued, "In every instance

of his seeking treatment due to depression and anxiety, the emotional distress was related to workplace issues." The letter then stated, "I support Mr. Raffone's request to change positions and work in a new department of the City."

109.   On April 28, 2016, Dr. Witte wrote a letter to Robin Ladson, City of New Haven Human Resources, releasing Plaintiff to return to "full-time work, with no restriction, effective Monday, May 2, 2016."

110.   On May 2, 2016, Plaintiff attempted to return to work but was informed by Mr. Librandi that the OBIE was an "unhealthy environment to go back to" and that Mr. Turcio stated that he was not ready to have Plaintiff back.

111.   Plaintiff was forced to stay out of work despite clearance and medical documentation provided on April 28, 2016, by Dr. Witte to HR releasing Plaintiff back to full time work without restrictions effective May 2, 2016.

112.   On May 2, 2016, Plaintiff's attorney, Patricia A. Cofrancesco, Ms. Poindexter, and Mr. Librandi communicated concerning a possible transfer to an available position of Housing Code Inspector in LCI. It was agreed that Plaintiff would be contacted for an interview.

113.   Plaintiff was subsequently interviewed for the position, but never heard back about it. Plaintiff later learned that the position was awarded to a less qualified individual who had been temporarily placed in the position during the search process and then transferred to a new position.

114.   Plaintiff was not returned to his original job, or a substantially equivalent job, until the end of July 2016 despite medical documentation releasing him. Throughout this period of time Plaintiff was not paid wages by Defendant.

115.   On May 10, 2016, Plaintiff submitted an ADA Accommodation Request Form

seeking a transfer as a reasonable accommodation and submitted it to Michelle

Duprey, Director of the Department of Services for Persons with Disabilities.

116.   On June 20, 2016, Ms. Poindexter sent an email to Mr. Librandi requesting an

update on Plaintiff's return to work. In this communication, Ms. Pointdexter noted

that Mr. Turcio refused to allow Plaintiff to return stating he was not ready to have

Plaintiff back, Plaintiff's doctor had released him to return to full duty on May 2,

2016, and to date, Plaintiff had not been allowed back to work. She further noted

that Plaintiff requested an accommodation, was placed on a transfer list, interviewed

for the LCI position, yet had never received a response to his request.

117.   On July 13, 2016, Plaintiff received an email from Mr. Librandi indicating that Ms.

Duprey was finalizing her review of the accommodation request.

118.   On July 14, 2016, Plaintiff received a letter from Ms. Duprey concerning his

accommodation request. The letter stated: "First, you requested a transfer. Because

of strict civil service and union rules, we cannot summarily transfer you to any open

position. You may, however, submit your name for consideration for any suitable

position for which you are qualified." The letter went on to state that Plaintiff's health

care provider recommended that he be allowed to take 10-15 minute breaks when

he had difficulty with anxiety and that "given this recommendation, we feel it is a

reasonable accommodation to grant you the ability to take a break at those times, to

the extent possible. Any time taken for such breaks must be communicated to

Dennice Pair and must be made up or may use any of your accrued sick time off, as

25

you must maintain your 35-hour work week. You will be expected to return to your normal duties after fifteen minutes."

119.   At the time of this letter, Plaintiff's name was already on the transfer list and he had already received approval from civil services for a transfer.   There was no civil service or union impediment to transferring Plaintiff to this position if Plaintiff desired the transfer and the union agreed.   Other employees of the City of New Haven who were not disabled were allowed transfers of the type that Plaintiff requested.

120.   On July 15, 2016, Plaintiff received a Memorandum from Mr. Turcio regarding accommodation and return to work. This memo outlined specific performance expectations for Plaintiff and noted the accommodation he had been granted, but also included conditions and requirements of utilizing this accommodation.

121.   The July 15, 2016 Memorandum also advised Plaintiff that, since he was on a leave of absence when Mr. Turcio had requested to meet with him regarding his February 22, 2016 email, that this meeting had been rescheduled for July 25, 2016 and would be a "Laudermill [sic] at which you may have union representation, as the review of these matter could lead to discipline."

122.   On July 15, 2016, Ms. Poindexter requested the meeting be postponed and protested, "John['s] job description speaks for itself and you can't treat him differently than you treat other employees. There is no quota regarding permits on his job duties. Please be mindful that you have other employees who take multiple breaks maybe not as many as is recommended for John but they do take them. They don't give notice to anyone that the[y're] going on break and they don't make up the time

or dock their accruals. It's important that every employee is treated in the same manner and this include[s] John."

123.    Plaintiff returned to work on July 20, 2016.

124.    Upon his return, Plaintiff was once again assigned to busy work closing out old roofing and siding permits and was not performing the same or similar duties and responsibilities upon his return as he was performing prior to taking leave.

125.    Further, when Plaintiff returned to work, a new inspector had been hired and was assigned to Plaintiff's office within 30 days prior to Plaintiff's return. As a result, Plaintiff was placed at the reception desk at the entry of the offices.

126.    On July 26, 2016, a Loudermill hearing was held concerning Plaintiff's February 22, 2016 email. At this hearing, Mr. Turcio brought up the issue regarding Plaintiff's performance with respect to the allegation that Mr. Turcio had failed to inspect the property at 260 Crown Street and that another employee had signed a form relating to a modification of the rules for a mechanical inspection at 216 Nicholl Street.  Both of these issues were raised in retaliation for Plaintiff's complaint that a contractor claimed Mr. Turcio had ignored his official duties to inspect for building code violations.  The hearing ended when Mr. Turcio and Mr. O'Neill began yelling while Plaintiff explained the situation and stormed out of the hearing.

127.    Upon his return to work, Plaintiff continued to address building code violation and unethical practices and brought these concerns to his superiors.

128.    On July 28, 2016, Plaintiff sent an email to Mr. O'Neill and Mr. Piscitelli concerning 808 Chapel Street. In this email, Plaintiff recapped the situation from February 17, 2015 after he discovered the soffit hanging as a danger to the public.

Plaintiff also noted that after the collapse of the building that Mr. Turcio informed him of the receipt of the engineering report. Plaintiff stated, "I cannot help but to think if there was a report and he saw what the photos show just prior to the collapse that he would have immediately ordered the owner to demolish due to the conditions that existed when they were responding to the exterior condition that caused the call for action. This should have been done before risking the lapse of time in a very important public safety issue like this one that was noted as unsafe for some time."

129.    After the Loudermill hearing on July 28, 2016, Plaintiff sent an email addressing the concerns raised about 260 Crown Street and 216 Nicholl Street to Mr. Turcio, Mr. Piscitelli, Mr. O'Neill and Ms. Poindexter and indicated he would be happy to meet and review areas of concern.

130.    On July 28, 2016, Ms. Poindexter sent an email to Ms. Duprey, copied to Alan Bush, Department of Public Works Deputy Director, Mr. Brooks, Mr. Piscitelli and Mr. Turcio concerning Plaintiff's accommodation letter stating: "These requirement[s] gives the Department the ability to single him out, harass and to target him. Other employees in that department take breaks on a daily basis and there is no tracking of these breaks and no monitoring of the time they take and they don't report it to anyone. They also don't deduct those breaks off of their accrued paid time off. I've … already voiced these concerns with Jim and Michael. It seems that he is getting penalized for requesting an accommodation. I would appreciate it if you would review this language."

131.    On August 1, 2016, Mr. Turcio responded to an email Plaintiff sent to Mr. O'Neill, copied to Mr. Turcio, concerning permit books and a request for advanced vacation

time.  Plaintiff had also requested an additional accommodation in the form of a

chair.  Mr. Turcio stated: "You will continue to do the work you were given. As for the

work you discovered without permits did you stop the job or not??? And again I will

not sign any advanced pay. As far as your chair the department does not have any

funds to buy furniture."

132.   On August 1, 2016, Ms. Poindexter sent an email to Mr. Turcio, copied to Mr.

Brooks and Mr. Bush, concerning Plaintiff's request for advancement of his vacation

time and Mr. Turcio's denial, seeking a written explanation as to why Plaintiff's

request was denied.  No explanation was provided.

133.   On August 8, 2016, Mr. Piscitelli sent an email to Ms. Poindexter, Mr. Turcio and

Scott Nabel, Public Safety Human Resource Officer, Office of Labor Relations,

concerning the Loudermill discussion and a follow up log, attaching documents.

134.   On August 9, 2016, Ms. Poindexter responded to this email, pointing out

disparate treatment in Plaintiff's case, as follows.

> There are a few things you seem to have left out. A Loudermill
> hearing is part of due process requirement that must be provided to
> an employee prior to issuing discipline. As I stated at the meeting
> discipline was already issued to John when they took away his
> work, email, office, chair and phone so Management violated his
> rights to due process…The Union requested information that is
> supposed to be supplied by the Department. This summer flex
> schedule can be considered a violation of MERA and the Collective
> bargaining agreement. It was discussed at the meeting that John
> would be afforded the same flex opportunity as the other
> employees…You also fail to mention that Jim and Dan walked out
> of the meeting. They asked John to explain all the allegation that he
> had made or was making and he started to do that and they both
> got upset, started yelling and walk out of the meeting…"

135.   On August 10, 2016, Plaintiff advised Ms. Poindexter in an email that "many retaliatory issues continue" and that he was keeping Mr. Piscitelli in the loop. Plaintiff further noted that he got his own chair to help with his neck problems and further advised her that his directors "avoid any conversation with me and have shared information with other inspectors that make them leery of me."

136.   On August 12, 2016, Plaintiff received an email from Mr. Turcio indicating he was monitoring Plaintiff's arrival and departure from work and noted that Plaintiff was seen leaving work early the day before.

137.   Plaintiff left work early on August 11th for a previously scheduled doctor appointment.

138.   On August 12, 2016, Plaintiff sent an update email to Ms. Duprey advising her that the incident of leaving early was for the scheduled doctor's appointment. Plaintiff also advised her that Mr. Piscitelli was helping Plaintiff to get a regular desk area after his supervisors gave Plaintiff's desk away knowing full well that he expected to return to work. Plaintiff also noted that at the Loudermill hearing it was pointed out, by Ms. Poindexter, that there was no good reason that he was not allowed to return to work with all his past duties without cause.

139.   On August 22, 2016, Plaintiff sent an email to Mr. Turcio requesting that his permit books be returned to him in order to allow Plaintiff the opportunity to timely complete permits and save on mileage.  Plaintiff also noted Mr. Turcio's request to stop sending violation letters.  Plaintiff informed Mr. Turcio that Plaintiff's access card was still not working and requested a privacy screen to avoid regular

interruptions that occurred at Plaintiff's reassignment to a temporary, busy desk location.

140.   On August 31, 2016, Plaintiff again addressed violations concerning work performed without building permits, work performed without building inspections and low valuations on permits that were depriving the City of New Haven of fees via email with Mr. Turico. Specifically, Plaintiff noted that "On 14 Trumbull, Dan O'Neill has a foundation permit with no inspections and it appears the work was completed with no permits and no inspections. You should look into this. Also as a side note to permit valuations. If you look at the permit for 67 Trumbull Street the work being done is far in excess of the permit. Looking at this issue could keep things fair and allow us to do what is allowed with valuations. This could really help the city."

141.   In doing an inspection for a siding permit on a property located at 34 West Street, Plaintiff signed off on the siding permit, as the siding was completed. However, Plaintiff saw several potential building code violations at the property and immediately notified Mr. Turcio of the discoveries.

142.   On August 31, 2016, Mr. Turcio responded, "John stay on your jobs and do not go on a job not assigned to you last time I'm going to tell you this"

143.   On September 6, 2016, Plaintiff sent an email to Mr. Turcio and stated the following: "There are many issues at this address with older permits and sign offs that do not make sense." Plaintiff further advised that plumbing and electrical work was done without permits and that work was done without inspections. Plaintiff further inquired as to how the property owner was allowed to obtain a building permit without paying taxes.

144.   In the same email exchange, Plaintiff also questioned if tying a new permit to an

old permit was legal and specifically asked, "How are you making out with the

important discoveries like Buildings being constructed without permits and unsafe

steps in a required exit while giving a certificate of occupancy to occupy while an

unsafe conditions exist."

145.   On September 16, 2016, Plaintiff requested additional work from Mr. Turcio,

asking to be provided with more permits daily and offered to take on additional work

to help others, noting he had only received a few permits to close and could help

others.

146.   On September 26, 2016, Plaintiff sent an email to Ms. Poindexter referencing the

prior Friday, September 23rd. Plaintiff informed her that after feeling weak and calling

for help to go to the hospital, he underwent 2 days of testing which confirmed "that

my high blood pressure is causing aneurysm in my head and that stress and anxiety

are the primary cause…they docked me and that's ok but it is unfair that the many

times that others do what they need to do and never get docked is just a sign of the

unfair tactics used to discredit those they want to."

147.   On October 28, 2016, Plaintiff sent an email to Mr. Turcio again addressing

concerns:

> Jim this morning when I parked next to you I hoped for a normal
> good morning and greeting. When I said I had hoped to return to
> my normal place in the department you said I was done and that I
> never said I [was] sorry to Dan O'Neil I am not sure what I should
> be sorry for. We protect the civilian population from harm and
> reporting unsafe structures is an important part of what we do.
> Today the class was about unsafe structures and we learned about
> timely reviews when we know a building is unsafe. That was the
> issue with 808 Chapel St. Bob Walsh, Mike Corbett and even you
> told me about unsafe buildings that were being held back from

demo for many reasons. There were many things told to me over a five year period that concerned me and resulted in reporting what I believe was unethical handling of some very important City matters that we are responsible for…The city has a responsibility to look into what appears to be a problem in our routines and information revealed by credible sources. That would be our coworkers that are licensed by the state. The Union has requested my routines, my location, my lost pay and pension and my credibility be restored and remains undone for what reasons I do not understand but will continue to look into for the sake of public safety and the resolve to a hostile environment that is persistent in hopes that you will discourage me into leaving before I am ready.

148.   On October 28, 2016, Plaintiff met with Mr. Turcio who informed him that they were looking to transfer him and said it should take about a week.  Mr. Turcio suggested Plaintiff take the week as paid administrative leave until the transfer.

149.   On October 28, 2016, Mr. Turcio provided Plaintiff with a letter which stated, "As a follow-up to our conversation this afternoon, effective immediately you will be on administrative leave with pay starting at the end of business today, October 28, 2016 continuing through Friday, November 4, 2016…"

150.   Plaintiff remained out on paid leave past November 4, 2016 and next received a letter from Mr. Turcio, dated November 18, 2016, stating the City of New Haven was "placing you on paid administrative leave until further notice."

151.   Plaintiff was thus forced out of his job and placed on administrative leave by Defendant while it was allegedly looking to transfer him to a suitable position. Despite attempts to obtain reinstatement, including filing a complaint with the CHRO as set forth herein, to date, Plaintiff has not returned to work, despite his expressed desire to be reinstated to his position. Plaintiff finally interviewed for a position on December 15, 2017 but has not been offered the position as of the date of this

complaint because the City of New Haven is said to be considering other candidates.  Plaintiff remains out of work on a forced leave because the City of New Haven will not allow Plaintiff to work at the job he was hired to perform or to be transferred to a position that is comparable to the position he holds because management in the department and the City of New Haven would rather pay Plaintiff to remain out of work than to be at work pointing out the illegal and unethical practices set forth in this complaint.

152.   For example, in or about January 2017, Defendant offered Plaintiff a Warehouse Manager position with the Department of Public Works. Since Plaintiff had no previous experience as a manager in this department and the warehouse involved had numerous citations by OSHA that would not be conducive to Plaintiff's employment there, Ms. Poindexter responded that it would not be a good fit for Plaintiff and made a counter offer for the position of Neighborhood Specialist in LCI.

153.   Defendant then proposed a Mayoral transfer from the Building Inspector's Department to LCI in the position of Assistant Building Inspector, with the same duties and responsibilities, until November 2017 at which time Plaintiff would retire.

154.   On January 10, 2017, Ms. Poindexter informed Defendant that Plaintiff would accept the transfer, but not with the stipulation of retirement in November 2017.

155.   On January 11, 2017, Mr. Nabel responded that "any deal was predicated on the separation of Mr. Raffone at the time of vesting. As we also discussed, the City will have to now look to address his past misconduct and any future violations through disciplinary action."

156.   On January 12, 2017, Ms. Poindexter responded to Mr. Nabel noting that Plaintiff's first request "was a civil service transfer to another position which would have been a lateral move without any limitation."  Her email further stated: "If there was any past misconduct you would have addressed it or disciplined John long time ago. John is the one who has been treated unfairly, has been caused undue stress, and harmed by the City's action. I just want to remind you that an ADA accommodation means he deserves equal treatment and shouldn't be isolated by the employer. We should discuss other options. Discipline isn't one of them."

157.   By Memorandum dated May 14, 2017 from Mr. Piscitelli, Defendant further attempted to discipline Plaintiff for raising concerns of public safety and unethical practices.

158.   This Memorandum was allegedly in follow up to the July 26, 2016 Loudermill hearing, specifically with respect to the matters raised by Mr. Turcio at the hearing, 260 Crown Street and 216 Nicoll Street.

159.   Defendant concluded this Memorandum by stating that "use of the View Permit system, coupled with a confusing dialogue with Mr. Coyle, adversely affects our overall service delivery to the permittee and therefore merits disciplinary action." The Memorandum then misleadingly stated, "Mr. Raffone acknowledged at the Loudermill hearing that he coordinated a request for modification of the State Building Code to the State Building Official without obtaining the department head's signature on the request form" and concludes "This action adversely affected our important professional relationship with State officials and merits disciplinary action."

160. By letter dated June 13, 2017 from Mr. Nabel, Plaintiff was advised that a pre-termination hearing was scheduled for June 30, 2017 relating to 260 Crown Street and 216 Nicoll Street projects.

161. The pre-termination hearing occurred on or about June 30, 2017. At this hearing, Mr. Piscitelli was asked if he asked Plaintiff about the allegations in the May 14 Memorandum and he responded that he had not.  At this hearing it was also revealed that no disciplinary action was taken against Mr. Rispoli in connection to 216 Nicoll Street modification that he affixed his signature to and submitted.

162. The June 30, 2017 "pre-termination meeting" ended without any decision being made.  However, on July 11, 2017, counsel for Plaintiff informed Defendant's Director of Labor Relations that any attempt to discipline Plaintiff based on the content of the February 22, 2016 email would violate Connecticut Whistleblower Statute, Connecticut General Statutes § 31-51m.

163. On July 28, 2017 and September 7, 2017, Ms. Poindexter sent emails once again indicating Plaintiff's willingness and desire to return to work, full duty without restrictions, to the position of Building Inspector.

164. Defendant has refused to return Plaintiff to work since he was forced to take a paid leave of absence in October of 2016.

165. Based on the foregoing, Defendant has discriminated against Plaintiff on the basis of his disability and has failed to provide reasonable accommodations for Plaintiff's disability in violation of the  Americans with Disabilities Act, 42 U.S.C. 12101 *et seq.*

166.     As a result of Defendant's actions, Plaintiff has suffered damages, including, but not limited to, economic losses, in the form of lost wages and benefits and medical bills.  Plaintiff has also suffered emotional distress, high blood pressure and an aneurysm based on excessive stress, loss of enjoyment of life, loss of enjoyment of profession, humiliation, and embarrassment.

167.     As a further result of Defendant's actions, Plaintiff has incurred, and will continue to incur attorneys' fees and costs in pursuing this action.

**COUNT TWO:**       **DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT, CONN. GEN. STAT. §46a-60 *et seq.***

1-164. Paragraphs 1 through 164 of Count One are hereby incorporated by reference and made paragraphs 1 through 164 of Count Two as though more fully set forth herein.

165.     Based on the foregoing, Defendant has discriminated against Plaintiff on the basis of his disability and has failed to provide reasonable accommodations for Plaintiff's disability in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. 46a-60(a)(1).

166.     As a result of Defendant's actions, Plaintiff has suffered damages, including, but not limited to, economic losses, in the form of lost wages and benefits and medical bills. Plaintiff has also suffered emotional distress, high blood pressure and an aneurysm based on excessive stress, loss of enjoyment of life, loss of enjoyment of profession, humiliation, and embarrassment.

167.     As a further result of Defendant's actions, Plaintiff has incurred, and will

continue to incur attorneys' fees and costs in pursuing this action.

**COUNT THREE:**     **RETALIATION IN VIOLATION OF THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT ("CFEPA"), CONN. GEN. STAT. § 46a-60(a)(4)**

1-164. Paragraphs 1 through 164 of Count Two are hereby incorporated by reference and made paragraphs 1 through 164 of Count Three as though more fully set forth herein.

165.   Defendant retaliated against Plaintiff in response to his speech by forcing him to take a leave of absence in December 2015 through February of 2016, by preventing him from performing his job duties, by forcing him to take an unpaid leave of absence between April and July 2016, by taking away his job duties and responsibilities, by removing Plaintiff's office accommodations, by not allowing a flexible schedule, by forcing him out on paid administrative leave on October 28, 2016 against his will, by refusing to provide Plaintiff with meaningful job opportunities and by refusing to return Plaintiff to work.  Based on the foregoing, Defendant retaliated against Plaintiff for opposing discriminatory conduct in violation of the Connecticut Fair Employment Practices Act, Connecticut General Statutes §46a-60(a)(4).

166.   As a result of Defendant's actions, Plaintiff has suffered damages, including but not limited to the loss of wages and benefits and medical bills, and has suffered emotional distress, high blood pressure and an aneurysm based on excessive stress, loss of enjoyment of life, loss of enjoyment of profession, and harm to reputation. Plaintiff has also incurred, and will continue to incur, attorneys' fees and costs.

**COUNT FOUR:**     **RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITY ACT, 42 U.S.C § 12101 *et seq.***

1.-165.     Paragraphs 1 through 165 of Count Three are hereby incorporated

by reference and made paragraphs 1 through 165 of Count Four as though more fully set forth herein.

166.     Based on the foregoing, Defendant has retaliated against Plaintiff for opposing discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

167.     As a result of Defendant's illegal conduct, Plaintiff has suffered damages, including, but not limited to economic loss in the form of lost wages and benefits and medical bills. Plaintiff has also suffered emotional distress, high blood pressure and an aneurysm based on excessive stress, loss of enjoyment of life, loss of enjoyment of profession, humiliation, embarrassment and harm to reputation.

168.     As a further result of Defendant's actions, Plaintiff has incurred, and will continue to incur, attorneys' fees and costs in pursuing this action.

**COUNT FIVE:       VIOLATION OF C.G.S. SEC. 31-51q**

1.-165.       Paragraphs 1 through 165 of Count Four are hereby incorporated by reference and made paragraphs 1 through 165 of Count Five as though more fully set forth herein.

166.     Beginning in 2008 and continuing to through 2016, Plaintiff engaged in protected activity, exercising his rights guaranteed by Article First, Section 3 and 4 of the Constitution of the State of Connecticut, when he reported the unethical practices, abuse of authority, mismanagement of funds, official dishonesty, serious wrongdoing, unsafe building practices and properties, and threats to public health and safety to his superiors, including Mayor Harp.

167.     Defendant retaliated against Plaintiff in response to his speech by forcing

him to take a leave of absence in December 2015 through February of 2016, by

preventing him from performing his job duties, by forcing him to take an unpaid leave of

absence between April and July 2016, by taking away his job duties and responsibilities,

by removing Plaintiff's office accommodations, by not allowing a flexible schedule,

by forcing him out on paid administrative leave on October 28, 2016 against his will,

by refusing to provide Plaintiff with meaningful job opportunities and by refusing to

return Plaintiff to work.

168.     As a result of Defendant's violation of Connecticut General Statutes § 31-

51q, Plaintiff has suffered damages suffered damages, including the loss of wages and

benefits, including overtime pay, medical bills, loss of enjoyment of profession,

emotional distress, high blood pressure and an aneurysm based on excessive stress,

harm to reputation and loss of enjoyment of life.  Plaintiff has also incurred attorneys'

fees in the vindication of his rights.

**COUNT SIX:**       **INTERFERENCE WITH THE EXERCISE OF RIGHTS IN**
                     **VIOLATION OF FAMILY AND MEDICAL LEAVE ACT, 29 U.S.C.**
                     **§ 2601 *et seq.*,**

1-165. Paragraphs 1 through 165 of Count Three are hereby incorporated by

reference and made paragraphs 1 through 165 of Count Six as though more fully set

forth herein.

166.     Defendant interfered with Plaintiff's rights under the FMLA when it refused

to allow Plaintiff to return to work on May 2, 2016 when he provided medical clearance

to return to work, full duty, without restriction.

167.     Defendant further interfered with Plaintiff's rights under the FMLA when it

failed to return Plaintiff to his original or equivalent position in February and May of 2016.

168.     Defendant further interfered with Plaintiff's rights under the FMLA when it placed Plaintiff on an indefinite paid leave of absence in October of 2016.

169.     Defendant has interfered with Plaintiff's exercise of rights provided by the FMLA in violation of 29 U.S.C. § 2615(a)(1).

170.     As a result of Defendant's conduct, Plaintiff has suffered damages, including, but not limited to, economic losses, in the form of lost salary, employment benefits and other compensation.

171.     As a further result of the actions of Defendant, Plaintiff has incurred, and will continue to incur, attorneys' fees and costs in pursuing this action.

**COUNT SEVEN     RETALIATION IN VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT, 29 U.S.C. § 2612(a)(1) *et seq.,***

1-165     Paragraphs 1 through 165 of Count Six are hereby incorporated by reference and made paragraphs 1 through 165 of Count Seven as though more fully set forth herein.

166     Plaintiff was eligible and entitled to FMLA leave.

167.     Plaintiff provided Defendant with adequate notice of his request for FMLA leave, as well as sufficient information to inform Defendant that he requested leave for a protected reason.

168.     Defendant refused to allow Plaintiff to return to work despite proper medical clearance and forced Plaintiff to remain out of work on an unpaid leave against his will to intentionally retaliate against him for exercising his rights under the FMLA in violation of 29 U.S.C. § 2615(a)(2).

169.    Defendant further retaliated against Plaintiff's under the FMLA when it placed Plaintiff on an indefinite paid leave of absence in October of 2016 in violation of 29 U.S.C. § 2615(a)(2).

170.    As a result of Defendant's illegal conduct, Plaintiff has suffered the loss of wages and benefits, and medical bills, and has suffered emotional distress, high blood pressure and an aneurysm based on excessive stress, loss of enjoyment of life, loss of enjoyment of profession, and harm to reputation.

171.    As a further result of the actions of Defendant, Plaintiff has incurred, and will continue to incur, attorneys' fees and costs in pursuing this action.

## DEMAND FOR RELIEF

**WHEREFORE**, the plaintiff demands a trial by jury and judgment against Defendant as follows:

1.    Legal relief, including past and future economic and non-economic compensatory damages including lost wages, back pay, lost employment benefits, loss of enjoyment of life, emotional distress, humiliation, and embarrassment and harm to reputation pursuant to common law and Connecticut General Statutes § 46a-104 and 42 U.S.C. § 1981a

2.    Equitable relief, including reinstatement or front pay, pursuant to Connecticut General Statutes § 46a-104 and 42 U.S.C. § 1981a;

3.    Punitive damages pursuant to common law, 42 U.S.C. § 1981a, Connecticut General Statutes § 46a-104 and Conn. Gen. Stat. § 31-51q;

4.    Attorney's fees Connecticut General Statutes § 46a-104 and 42 U.S.C. §

12205; 42 U.S.C. § 1988 and Conn. Gen. Stat. § 31-51q

5.    Interest ; and

6.    Such other relief as in law or equity may pertain

Dated at New London, Connecticut this 19th day of December, 2017

PLAINTIFF
JOHN A. RAFFONE

By: _____

Jacques J. Parenteau (ct09771)
Madsen Prestley & Parenteau, LLC
105 Huntington Street
New London, CT 06320
Tel: (860) 442-2466
Fax: (860) 447-9206
Email: jparenteau@mppjustice.com